UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| **LUIS NINO & KIRK MASSEY,** § § § **Plaintiffs,** § § **v.** § § **CITY OF BROWNSVILLE,** § **ORLANDO C. RODRIGUEZ and** § **DAVID M. DALE,** § § **Defendants.** § | Civil Action No. 1:18-CV-00061 |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF THE COURT:

Luis Nino and Kirk Massey, Plaintiffs, complain of the City of Brownsville, Texas, Orlando C. Rodriguez, Brownsville Police Chief, and David M. Dale, Brownsville Police Commander, and for cause of action would show the following.

## I.   NATURE OF THE ACTION

1. This is an action for declaratory and injunctive relief, and compensatory and exemplary damages, filed under 42 U.S.C. §1983, wherein Plaintiffs contend that the Defendants discriminated against them in retaliation for their association with a labor organization, the Brownsville Police Officers' Association, and for their protected political speech on the Association's behalf, in violation of their rights of freedom of speech and association guaranteed by the First and Fourteenth Amendments to the United States Constitution.

## II.   JURISDICTION & VENUE

2. Jurisdiction of this action is conferred upon the Court by 28 U.S.C. §§1331 and 1343. Venue lies within this district pursuant to 28 U.S.C. §1391.

### III. PARTIES

3. Plaintiff Luis Nino is a citizen of Texas residing in Cameron County, Texas. Plaintiff is an employee of the City of Brownsville who at all times relevant to this action was working as a Sergeant in the Brownsville Police Department.

4. Plaintiff Kirk Massey is a citizen of Texas residing in Cameron County, Texas. Plaintiff is an employee of the City of Brownsville who at all times relevant to this action was working as a Lieutenant in the Brownsville Police Department.

5. Defendant City of Brownsville **("City")** is a municipal corporation organized under the laws of the State of Texas. Defendant City has been served with process and has answered herein.

6. Defendant Orlando C. Rodriguez is an individual who at all times relevant to this action was employed by Defendant City of Brownsville as its Police Chief. Defendant Rodriguez is sued in his individual capacity only. Defendant Rodriguez has been served with process and has answered herein.

7. Defendant David M. Dale is an individual who at all times relevant to this action was employed by Defendant City of Brownsville, holding the rank of Commander in the Brownsville Police Department. Mr. Dale is sued in his individual capacity only. Defendant Dale has been served with process and has answered herein.

### IV. FACTUAL ALLEGATIONS

8. Defendant City and its Police Department are and have been at all relevant times governed by the Fire & Police Civil Service Act, Texas Local Gov't Code Chapter 143 ("CSA"), as a result of a local adoption election of Brownsville's citizens.

9. Defendant City and its Police Department are and have been at all relevant times governed by the Fire & Police Employee Relations Act, Texas Local Gov't Code Chapter 174 ("FPERA"), as a result of a local adoption election of Brownsville's citizens.

10. Pursuant to the FPERA, Defendant City has recognized the Brownsville Police Officers' Association ("BPOA"), a public employee labor union, as the exclusive bargaining agent for Brownsville police officers. The BPOA in turn is a member Local of the Combined Law Enforcement Associations of Texas ("CLEAT"). Defendant City and the BPOA have been parties to a series of collective bargaining agreements governing the wages, hours, and other conditions of employment of Brownsville police officers. The current Agreement between Defendant City and the BPOA became effective on or about October 1, 2014. Its stated term expires on September 30, 2019.

11. Plaintiff Nino is the elected President of the BPOA, having been elected to that position on December 8, 2017. Plaintiff Massey is the elected 3rd Vice President of the BPOA, and is also a member of the Board of Directors for CLEAT, representing District 2. In their positions with BPOA and CLEAT, they are the two most important and visible officers of the union.

12. Prior to 2016, Defendant Rodriguez had a more or less cooperative relationship with the BPOA and its then-President Kurt Hines concerning union matters such as discipline and investigation of officers. However, Defendant Rodriguez's approachable style changed after the BPOA resisted changes that Rodriguez sought during negotiation of a new labor agreement. Specifically, Rodriguez proposed implementing a physical fitness requirement for officers. The BPOA supported an incentive-based fitness requirement, but resisted when Rodriguez further sought the ability to fire officers who failed the standard. When the parties were unable to agree, the BPOA refused to include the fitness standard in the new labor agreement.

13. Defendant Rodriguez immediately began to retaliate. For example, he terminated an existing program that allowed officers to use their last hour in a 10-hour shift for physical exercise. Additionally, Defendant Rodriguez abandoned his collaborative approach with the union and Hines, becoming stand-offish and unapproachable.

14. Prior to March 2016, BPOA President Hines approached Defendant Rodriguez about union members' concerns that the Chief's hire of a female employee violated the City's anti-nepotism policy. When Rodriguez failed to act on the BPOA complaints, a CLEAT attorney filed a formal complaint concerning the matter, and Hines sent a letter to BPOA members updating them on the issue. On March 21, 2016, Rodriguez responded by sending an email to all sworn personnel that constituted nothing less than an attack on BPOA leadership and an attempt to divide the BPOA's membership. In the email, Defendant Rodriguez accused Hines of "flat out lies" and "push[ing] his own agenda." He further stated: "Your leadership should unite all members and not cast aside those that don't follow his lead or agree with what he says." He told the officers under his command: "Your leader is not loyal to you, he is loyal to a select few, and of course, himself." In the same email, he specifically denied he was retaliating against union leaders who he felt were lying about him. Additionally, Defendant Rodriguez told members of the BPOA board that he would no longer meet with Hines and that he would not meet with any other BPOA officers unless other witnesses were present. Shortly thereafter, Hines resigned his position with the BPOA and retired from the BPD. Hines was replaced as President by Jaime Ortega.

15. In the Fall 2016, Defendant Rodriguez discontinued a patrol shift that had allowed officers to work four 10-hour days rather than the more traditional 5-day, 8-hour schedule. After polling its members, the BPOA decided to oppose the elimination of the 4/10 shift schedule. The BPOA circulated a petition that was signed by about 70-80% of its membership, and turned in the

petition to the City Manager, who shared it with Defendant Rodriguez. At the next Labor Relations Committee meeting with BPOA officials, Defendant Rodriguez expressed anger about the petition, and announced he was refusing a BPOA request to delay implementation of the shift schedule change because of the BPOA petition. The BPOA then initiated a grievance under the collective bargaining agreement contesting the shift change.

16. In September 2016, a Brownsville police officer under Plaintiff Nino's command posted a comment on Facebook critical of Defendant Rodriguez's decision to eliminate the 4/10 shift. Although the officer was off-duty at the time of the post, Rodriguez ordered Nino to investigate the incident through his immediate supervisor, and then to issue the officer a written Verbal Counseling concerning the post. Nino did as ordered, but wrote to Defendant Rodriguez via Inter-Departmental Communication ("IDC") that he felt the officer's remarks were within his First Amendment rights. Rodriguez did not respond to Nino's memo.

17. The BPOA and CLEAT decided to conduct a rally of police officers requesting continuance of the 4/10 shift schedule. Shortly after this decision was made, BPOA President Jaime Ortega resigned, and was replaced as President by Antonio Flores. The rally occurred on December 20, 2016. The rally was attended by off-duty police officers and their family members. The attendees first gathered at Linear Park, where CLEAT officials and BPOA First Vice President Robert Tyler spoke. They then walked to the Brownsville Police Station, and then to City Hall. There was press coverage of the rally, and Tyler issued a statement. At no time, in any of the three locations, did any rally participant block ingress or egress to city buildings or facilities, or advocate any type of work stoppage in support of their cause. The rally was completely lawful exercise of the officers' First Amendment rights, and Rodriguez was so advised by others in City administration. Nonetheless, Defendant Rodriguez caused each officer identified as attending the

rally to be investigated by the BPD's Internal Affairs Division ("IA") for participating in an illegal strike or work stoppage in violation of the FPERA, as well neglect of duty and conduct prejudicial to good order. Two weeks after the rally, BPOA President Antonio Flores resigned from the BPD, and 1st VP Robert Tyler became the BPOA President.

18. In early 2017, Defendant Rodriguez met with BPOA President Tyler concerning the ongoing investigation of officers who had participated in the union rally. Afterwards, Tyler announced that he had struck a deal with Rodriguez. Under the terms of the deal, Tyler agreed to accept a one-week suspension in exchange for Rodriguez's agreement not to discipline other officers participating in the rally. Other officers instead received "letters of admonishment" that stated, in part:

> In view of the acceptance of responsibility for this unfortunate incident by certain key personnel, and by the union board as a whole, I am concluding this matter as to your involvement with simply a letter of admonishment. The admonishment is basically this, that even though you received bad advice or were not fully informed, it is still your responsibility as a TCOLE certified and commissioned law enforcement officer, and as a member of a bargaining unit, to be knowledgeable and aware of the appropriate standards, procedures, and limits for action in a collective bargaining context. It is your professional responsibility to not let yourself be placed in this type of situation, either as a law enforcement officer, or as a union member. I am hopeful that this type of incident or event will not occur again.

Tyler served his suspension in March 2017. He thereafter decided not to seek reelection as the BPOA President. He thereby became the fourth BPOA President in less than two years that abandoned his leadership position with the BPOA after conflict with Defendant Rodriguez.

19. When Tyler announced his decision not to seek reelection as BPOA President, Plaintiff Nino indicated he would run for BPOA President to succeed Tyler. He became BPOA President officially on December 8, 2017. Shortly thereafter, Defendant Dale asked Nino to attend

a private meeting in his office. During the meeting, Dale made remarks critical of CLEAT, and suggested to Nino that the officers would be better off without the union.

20.     Later in December 2017, Plaintiff Nino asked Defendant Rodriguez for an "introductory meeting" in Rodriguez's office to discuss Nino's role as BPOA President. During the meeting, Nino told Rodriguez that he would be candid and tell Rodriguez when he thought Rodriguez was doing something wrong. Rodriguez told Nino that Nino needed to be careful about saying that the administration was doing something wrong, and that he needed to remember he was an officer under Rodriguez's command. Rodriguez also told Nino that the BPOA members would not support Nino, and recounted how the BPOA membership had failed to support the last four Presidents. Rodriguez then told Nino that he had a hard time in front of him. When Nino replied that he was not like the past union presidents, Rodriguez told him he would need to learn to wear two different hats, and that he was part of the administration whether he saw it or not. Rodriguez concluded the meeting by wishing Nino good luck.

21.     Commencing in December 2017, the BPD administration began retaliating against Plaintiff Nino, papering his file with documentation of alleged performance deficiencies. On December 12, 2017, Nino received a "counseling" for alleged failures in his handling of a disciplinary recommendation concerning an officer under his command, and a "written verbal warning" for his disciplinary report concerning another officer's traffic accident. On December 18, 2017, the "counseling" was converted to a "counseling record."

22.     In January 2018, Plaintiff Nino used the BPD email system to email supervisors to request meetings with officers to address issues of concern to the officers. Although the collective bargaining agreement specifically allows the BPOA to conduct such meetings in police facilities, and to use the departmental email system to communicate concerning BPOA activities, on January

18, 2018, Defendant Rodriguez emailed Nino and ordered him not to use the departmental email system without advance authorization. Nino emailed back that his use of the email system was consistent with the agreement, but got no response.

23.   On December 7, 2017, Defendant Dale issued a directive to his Police Lieutenants instructing them to apprise their officers not to use personal cameras to take crime scene photos for report/investigative purposes. This violated a longstanding practice of using personal cameras for this purpose. In fact, department training personnel had provided past training to officers on use of their personally owned cameras for this purpose, and a provision of the collective bargaining agreement specifically authorizes officers to use their personal equipment provided it meets or exceeds city-established standards. On January 19, 2018, BPOA President Nino filed a grievance on behalf of the Association contesting the order not to use personal cameras for this purpose.

24.   On January 24, 2018, the BPOA Treasurer asked Defendant Rodriguez for Association Leave to cook for officers staffing a parade. Such leave had been routinely granted in the past. In this case, however, Defendant Rodriguez denied the request, citing Nino's January 19, 2018 grievance as the reason for the denial.

25.   On the night of January 28-29, 2018, while on duty, Plaintiff Nino and subordinate officers responded to a "Subject Shot" call to 911. Upon arriving at the scene they found a victim with a gunshot wound, apparently dead. No other persons were then present, nor was a weapon found, converting the scene to a possible homicide investigation. He immediately requested the dispatch of a Crime Scene team with a camera. However, EMS personnel determined that the victim was in fact still alive, but in need of immediate transport to the hospital. As they prepared to move the victim, Sgt. Nino determined that the Crime Scene team had not arrived and no city-owned camera was yet on-scene. Afraid of the loss of potential evidence, he therefore instructed a

subordinate officer to take crime scene photos with his personally-owned camera before EMS personnel moved the victim. Nino then provided a written report to his Lieutenant at approximately 3:18 a.m. on January 29, 2018. In the report, he acknowledged Commander Dale's prior directive to use only city-owned cameras, then explained the exigent circumstances upon which he made the decision to have a subordinate officer use a personally owned camera for evidence preservation.

26. On January 30, 2018, Defendants placed Plaintiff Nino on Administrative Leave with pay pending an IA investigation of his decision to allow use of a personally owned camera to collect evidence during the January 28-29, 2018 incident. His badge, gun, credentials, belt and key card were taken from him, as was his take-home police car. He remained on Administrative Leave for months thereafter, during which he was required to be at his residence Monday – Friday, 8:00 am to 5:00 pm. He was also instructed not to discuss the facts underlying his suspension with anyone other than an attorney. He was further precluded from overtime assignments that he normally would have worked, and from working "side jobs" necessitating his law enforcement credentials, thus resulting in pay loss as a result of being placed on leave.

27. On February 5, 2018, Nino was given an Employee Warning Notice for failing to request a city-owned camera to photograph a crime scene on December 1, 2017, an event that had occurred six days prior to Defendant Dale's notice to the Lieutenants. On March 20, 2018, this Notice was amended to add a charge of failing to perform his duties and responsibilities during the December 1, 2017 incident.

28. On June 8, 2018, after having been on administrative leave for over four months, Defendant Rodriguez "indefinitely suspended," i.e., discharged Plaintiff Nino from his employment with the Brownsville Police Department, based on his conduct in ordering a

subordinate officer to use a personally-owned camera at the January 28-29, 2018 crime scene in violation of Defendant Dale's directive.

29. On January 29, 2018, Defendant Dale instructed Plaintiff Massey to remind his Sergeants to instruct officers not to use personal equipment like cameras in the performance of their duties. Massey relayed the message to his Sergeants. Later that day the Sergeants provided feedback that officers were concerned and wondered if the instruction applied to personal equipment other than cameras. Massey therefore phoned Defendant Dale and told him the officers were concerned about whether they could continue to use personal equipment other than cameras. Dale told Massey to instruct his sergeants to tell their officers they could submit Inter-Departmental Communications, or IDC's, if they were concerned about the use of any particular personal equipment. Massey did as instructed, and several police officers did in fact compose IDC's to send to Dale concerning the personal equipment issue.

30. On January 29, 2018, Plaintiff Massey forwarded the officers' IDC's to Defendant Dale along with his own IDC to Commander Dale seeking clarification, and noting his belief that the true focus of this instruction was limited to the use of personal cameras (many officers carry, e.g., personally owned handcuffs, tourniquets and flashlights).

31. On February 6, 2018, Defendant Dale ordered Plaintiff Massey to come to his office. Fearing the interview was investigatory in nature, and per the collective bargaining agreement, Massey requested a union representative at the meeting with Dale. Dale denied his request. At the meeting, Dale gave Massey a list of nine questions that essentially accused Massey of ordering his subordinates to submit IDC's to Dale concerning the personal equipment issue. As ordered, Massey submitted written answers to the questions, denying that he had given any such orders, and that he had instead done exactly as Dale had instructed him.

32. On February 13, 2018, Plaintiff Massey, in his capacity as a union official, initiated the informal grievance process under the collective bargaining agreement by personally informing Defendant Dale that he was grieving Dale's refusal to comply with the notice and representation provisions of the agreement in regards to the February 6, 2018 meeting in which Massey was ordered to provide answers to written questions. Massey was motivated by the fact that Dale had established a pattern of interrogating officers for disciplinary purposes while denying that the interviews were investigatory in nature. His hope was to halt Dale's practice which was in flagrant violation of the officers' rights protected by the collective bargaining agreement.

33. On February 16, 2018, Plaintiff Massey was placed on administrative leave with pay during the pendency of an Internal Affairs investigation for unspecified misconduct. His badge, gun, credentials, belt and key card were taken from him, as was his take-home police car. He was also instructed not to discuss the facts underlying his suspension with anyone other than an attorney. Like Plaintiff Nino, he was instructed to remain at his residence Monday – Friday, 8:00 a.m. to 5:00 p.m. He was further instructed to refrain from outside law enforcement work, thus depriving him of weekend jobs at which he had been earning $150 or more each week. He also lost all overtime pay opportunities. He has remained on leave status at all times since February 16, 2018, a time period now spanning some five months and continuing.

34. On March 28, 2018, Plaintiff Massey received written notice of the allegations being investigated. Specifically, Defendant Dale alleged that Massey "recklessly or even deliberately instigated" the officers under his command to submit IDC's concerning use of personal equipment, and accused him of causing an insurrection. Defendant Dale further accused Massey of dishonesty with regard to his motives and intentions, and the role he played in causing the IDC's to be produced. On information and belief, during the ensuing Internal Affairs

11

investigation, Dale has been calling officers into his office for private interviews prior to their meetings with Internal Affairs investigators. Plaintiff Nino received this information only after his indefinite suspension, that is, when the gag order against him was no longer in place.

35.     As a result of the Defendants' actions, the two highest ranking BPOA officers both were placed on "house arrest" for five months and counting, unable even to communicate with others due to the gag orders imposed by the Defendants. Both have been deprived of overtime assignments and side jobs entailing loss of income, and both continue to be under the threat of further disciplinary action as a result of the charges pending against them. Further, Plaintiff Nino has been fired from his job, with attendant loss of employment, pay, health and pension benefits and seniority that he would have earned but for his loss of employment.

## V.     FIRST FEDERAL CAUSE OF ACTION – NINO – 42 U.S.C. §1983

36.     The preceding paragraphs of this Complaint are incorporated herein by reference. This cause of action is brought against Defendant City of Brownsville, and against Defendant Rodriguez in his individual capacity.

37.     Acting under color of State law, Defendant Rodriguez, acting in his capacity as the policy-making officer of Defendant City, suspended and otherwise took adverse action against Plaintiff Luis Nino, then discharged him from employment, in retaliation for his legitimate union activity, in violation of his rights of association and freedom of speech guaranteed by the First and Fourteenth Amendments to the United States Constitution.  The actions of Defendants City and Rodriguez did in fact deprive Plaintiff Nino of his First Amendment rights as those rights are secured to him by the provisions of the due process clause of the Fourteenth Amendment to the United States Constitution, made actionable by 42 U.S.C. §1983.

38. Defendant City is liable for the actions of individual Defendant Rodriguez, whose actions complained of herein, represent the official policy of Defendant City. The Defendant City acted through Defendant Rodriguez, who under the CSA is the official policy-making authority of the City with regard to the termination, suspension, discipline, and disciplinary investigation of civil service police officers. Defendant Rodriguez has full policymaking authority to decide City policy with regard to these matters, and his decisions in setting policy in these areas are not subject to review or control by others. The actions complained of herein were undertaken by the policy-making officials acting pursuant to a policy or custom by which BPOA officers and member have been punished and retaliated against for their union activities and association.

39. At the times of the actions complained of herein, it was well-established that Plaintiff Nino had a right protected by the First and Fourteenth Amendments to engage in political support and advocacy for a labor organization, and to be free from retaliation from government officials for so doing. The actions of the individual Defendant Rodriguez complained of herein were not objectively reasonable in light of this clearly established law.

40. The actions of individual Defendant Rodriguez complained of herein were undertaken without authorization of law, willfully, knowingly, and purposely, with the specific intent of depriving Plaintiff Nino of his protected First and Fourteenth Amendment rights. Defendant Rodriguez, in his individual capacity only, is thus liable to Plaintiff Nino for punitive damages.

VI. **SECOND FEDERAL CAUSE OF ACTION – MASSEY – 42 U.S.C. §1983**

41. The preceding paragraphs of this Complaint are incorporated herein by reference. This cause of action is brought against Defendant City of Brownsville, and against Defendants Rodriguez and Dale in their individual capacities.

42. Acting under color of State law, Defendant Rodriguez, acting in his capacity as the policy-making officer of Defendant City, and Defendant Dale, suspended and otherwise took adverse action against Plaintiff Kirk Massey, in retaliation for his legitimate union activity, in violation of his rights of association and freedom of speech guaranteed by the First and Fourteenth Amendments to the United States Constitution.  The actions of Defendants City and Rodriguez did in fact deprive Plaintiff Massey of his First Amendment rights as those rights are secured to him by the provisions of the due process clause of the Fourteenth Amendment to the United States Constitution, made actionable by 42 U.S.C. §1983.

43. Defendant City is liable for the actions of individual Defendant Rodriguez, whose actions complained of herein, represent the official policy of Defendant City.  The Defendant City acted through Defendant Rodriguez, who under the CSA is the official policy-making authority of the City with regard to the termination, suspension, discipline, and disciplinary investigation of civil service police officers. Defendant Rodriguez has full policymaking authority to decide City policy with regard to these matters, and his decisions in setting policy in these areas are not subject to review or control by others. The actions complained of herein were undertaken by the policy-making officials acting pursuant to a policy or custom by which BPOA officers and member have been punished and retaliated against for their union activities and association.

44. At the times of the actions complained of herein, it was well-established that Plaintiff Massey had a right protected by the First and Fourteenth Amendments to engage in political support and advocacy for a labor organization, and to be free from retaliation from government officials for so doing.  The actions of the individual Defendants Rodriguez and Dale complained of herein were not objectively reasonable in light of this clearly established law.

45. The actions of individual Defendants Rodriguez and Dale complained of herein were undertaken without authorization of law, willfully, knowingly, and purposely, with the specific intent of depriving Plaintiff Massey of his protected First and Fourteenth Amendment rights. Defendants Rodriguez and Dale, in their individual capacities only, are thus liable to Plaintiff Massey for punitive damages.

## VII. INJURY

46. Paragraphs 1-45 are incorporated by reference herein.

47. As a result of the foregoing acts committed against Plaintiffs by Defendants, Plaintiffs have suffered the following injuries:

    a. Plaintiff Nino has suffered and continues to suffer the loss of his employment, together with the wages and benefits earned by virtue of that employment, and by virtue of additional jobs made possible by that employment. Plaintiff Nino further has suffered the loss of earning capacity, which loss will continue indefinitely in the future.

    b. Plaintiff Massey has suffered and continues to suffer the loss of his employment and some of the wages and benefits earned by virtue of that employment, and by virtue of additional jobs made possible by that employment. Plaintiff Massey further has suffered the loss of earning capacity, which loss will continue indefinitely in the future.

    c. Plaintiffs have suffered, and continue to suffer, mental pain and anguish because of Defendants' wrongful acts; injury to their good names, character and general and professional reputation; embarrassment and humiliation; and loss of enjoyment of life.

    d. Plaintiffs have been deprived of having and exercising the rights and privileges guaranteed to citizens of the United States and the State of Texas by the First and Fourteenth Amendments to the United States Constitution.

46. Plaintiff are now suffering and will continue to suffer irreparable injury from the Defendants' policies, practices, customs and usages. Plaintiffs have no plain, adequate and complete remedy at law to redress the wrongs alleged, and this action for declaratory and injunctive relief, and for damages, is the only means of securing adequate relief.

## VIII.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants be cited to appear and answer, and that on final trial the Court award Plaintiffs the following relief.

A. Enter a declaratory judgment that the Defendants' actions complained of herein violated Plaintiffs' rights to freedom of speech and association guaranteed by the First and Fourteenth Amendments to the United States Constitution.

B. Permanently enjoin Defendants from violating Plaintiffs' rights to freedom of speech and association guaranteed by the First and Fourteenth Amendments to the United States Constitution.

C. Order the Defendants to restore to Plaintiffs all back pay and benefits lost to them as a result of Defendants' suspension of their employment, and in Plaintiff Nino's case, the termination of that employment.

D. Order Defendants to immediately reinstate Plaintiffs to their former positions with the Brownsville Police Department.

E. Award Plaintiffs compensatory damages in an amount in excess of the jurisdictional limits of the Court for Plaintiffs' past and future mental anguish, loss of earning capacity, and other losses specified hereinabove.

F.  Award Plaintiffs exemplary damages against Defendants Rodriguez and Dale in their individual capacities, for their willful and wanton acts in violation of Plaintiffs' constitutionally protected rights.

G.  Award Plaintiffs their attorney fees and costs pursuant to 42 U.S.C. §1988.

H.  Award Plaintiffs pre- and post-judgment interest at the maximum rate allowed by law on all back pay, compensatory damages and attorney fees and costs awarded.

I.  Award Plaintiffs such further and additional relief to which they may show themselves justly entitled.

## IX.

## JURY TRIAL DEMAND

Plaintiffs renew their request for a trial by jury on all claims so triable.

Respectfully submitted,

DEATS, DURST & OWEN, P.L.L.C.

/s/ B. Craig Deats
B. Craig Deats
TBN: 05703700
cdeats@ddollaw.com
Manuel Quinto Pozos
TBN: 24070459
mqp@ddollaw.com
707 W. 34th Street
Austin, Texas 78705
(512) 474-6200
FAX (512) 474-7896

COMBINED LAW ENFORCEMENT
ASSOCIATIONS OF TEXAS

Bob Leonard
TBN: 24048618
robert.leonard@cleat.org
1939 N. E. Loop 410, Suite 210

San Antonio, Texas 78217
(210) 826-1899
FAX (210) 826-2299

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document has been served upon the below-listed counsel for Defendants via electronic means and/or the Court's electronic filing system on this 20th day of July, 2018.

Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Robert Drinkard
rdrinkard@rampage-rgv.com
Denton Navarro Rocha Bernal & Zech, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
(956) 421-4904
FAX (956) 421-3621


/s/ B. Craig Deats
B. Craig Deats